1

2

3

4

5

6

7

8              IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10    TITUS L. WILSON,

11              Petitioner,              2: 08 - cv - 0419 - WBS TJB

12        vs.

13    J. WALKER, et al.,

14              Respondents.          FINDINGS AND RECOMMENDATIONS

15    _____/

16                     I.  INTRODUCTION

17        Petitioner is a state prisoner proceeding *pro se* with an application for writ of habeas

18    corpus pursuant to 28 U.S.C. § 2254.  Following a jury trial in 2004, Petitioner was convicted of

19    two counts of attempted murder along with corresponding enhancements.  Petitioner was

20    sentenced to two consecutive terms of fifteen years to life on each attempted murder conviction

21    along with two consecutive terms of twenty-five years to life for the corresponding

22    enhancements.  Petitioner seeks relief on several grounds; specifically:  (1) Petitioner's state and

23    federal constitutional rights were violated when the trial court denied his Wheeler/Batson motion

24    ("Claim I"); (2) there was insufficient evidence to support the jury's finding of a gang

25    enhancement pursuant to California Penal Code § 186.22(b)(1) for each of the attempted murder

26    charges ("Claim II"); and (3) there was insufficient evidence to support the jury's finding that

1

one of the attempted murders was deliberate and premeditated ("Claim III"). For the following reasons, it is recommended that the habeas petition be denied.

## II. FACTUAL BACKGROUND[1]

In successive confrontations, defendants Titus Wilson and Raymond Lopez participated in the shootings of Anthony Ciancio and Michael Fielding . . . .

A week before the shootings, Anthony Ciancio saw Wilson and Lopez riding Sacramento's Regional Transit Light Rail. Another person also saw Wilson and Lopez and that person said, "Norcade Piru," referring to the defendants' gang affiliation. Wilson and Lopez confronted the man and said, "Man, don't be saying Norcade Piru. It's East Side Piru."

On July 31, 2003, Michael Fielding, who was 18 years old and had been affiliated with a gang in the past, was staying with Michael Young at the residence of Young's relatives on Norcade Circle in Sacramento County. Around midnight or one o'clock the next morning, August 1, Wilson and Lopez arrived at the residence. Wilson asked to see Michael Young. Fielding told them Young was not there. Lopez asked for a drink of water, and Fielding got some water for them. Fielding told Wilson and Lopez to be quiet because the residents were sleeping. Wilson and Lopez stayed at the residence for 15 to 25 minutes, then left.

Minutes later, in the dark of the early morning, Ciancio saw Wilson and Lopez on the street. As the defendants approached Ciancio, he tried to walk away. Wilson said to Ciancio, "Where you from?" Believing the question to be an inquiry into his gang affiliation, Ciancio replied he was from Oak Park and he did not "gang bang." Wilson responded that he was Piru. Wilson asked if Ciancio was a South Side Crip, and Ciancio said he was not. Lopez moved toward Ciancio and reached for a gun in his waistband. As soon as Ciancio saw Lopez reach for the gun, he swung at Lopez, hitting him in the chin. As Ciancio turned and ran, Wilson said, "Shoot that mother fucker." Lopez shot Ciancio in the back. The bullet went through his torso and out the front. Ciancio made it to a relative's residence. He received treatment and, at the time of trial, wore a colostomy bag.

Wilson and Lopez ran back to the residence where Fielding was staying and banged on the door. Fielding opened the door and asked, "Are you guys running from the police? Cuz' if you are,

[1] The factual background is taken from the California Court of Appeal, Third Appellate District Opinion dated October 23, 2006 and filed with this Court as an attachment to Respondent's lodged document D on May 15, 2008 (hereinafter "Slip Op.").

you can't do that over here."  Lopez looked like he had been in a fight, and Wilson said Lopez had "got his ass whooped."  Wilson and Lopez sat on the couch.  Lopez laid down on the couch, with his head on Fielding's pillow, and appeared to be nodding off, so Fielding told him, "That's where I'm laying at.  You can't, you can't go to sleep.  You got to go."  Lopez asked for another drink of water, but Fielding told Lopez to get it himself or told Wilson to get it for Lopez.  Wilson asked to use the bathroom, and Fielding told him to go ahead but to be quiet because the residents were sleeping.

While Lopez was in the kitchen getting a drink of water, Wilson walked down the hall.  Fielding heard the sound of a gun being cocked and became nervous.  Wilson returned to where Fielding was and said he was leaving.  When Fielding opened the door, Wilson shot Fielding six times – twice in the chest, twice in the stomach, and one time in each arm.  During the shooting, Lopez was still in the kitchen.  Fielding testified Lopez looked "dumb" or "ignorant."  Wilson said, "Come on Nigga, we're leaving."  Lopez ran past Fielding and left the residence with Wilson.  Fielding survived the shooting but is disabled from the effects of the shooting.

(Slip Op. 1-5.)  Thus, to sum up the chronology during the overnight/early morning hours of July 31, 2003 - August 1, 2003, Petitioner (along with Lopez) first arrived at Michael Young's relatives' apartment where Fielding was staying.  Petitioner and Lopez subsequently left the apartment and eventually confronted Ciancio on the street.  After the Ciancio confrontation, Petitioner and Lopez returned to Young's relatives' apartment whereby Petitioner shot Fielding.

## III.  PROCEDURAL HISTORY

The jury found Wilson guilty of attempted murder of Ciancio and found true allegations that the attempted murder was committed willfully, deliberately, and with premeditation, involved a principal discharging a firearm and causing great bodily injury, and was committed for the benefit of a criminal street gang.  The jury also found Wilson guilty of attempted murder of Fielding and found true the allegations that the attempted murder was committed willfully, deliberately, and with premeditation, involved Wilson's personal use of a firearm causing great bodily injury, and was committed for the benefit of a criminal street gang.

(Slip Op. at p. 1-2.)

Petitioner appealed his judgment and conviction to the California Court of Appeal, Third

3

1    Appellate District.  That court affirmed the judgment on October 23, 2006.  In February 2007, the

2    California Supreme Court summarily denied the petition for review without discussion or

3    citation.  In February 2008, Petitioner filed the instant federal habeas petition.

4                    IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

5          An application for writ of habeas corpus by a person in custody under judgment of a state

6    court can only be granted for violations of the Constitution or laws of the United States.  See 28

7    U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

8    Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

9    Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

10   and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

11   320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

12   decided on the merits in the state court proceedings unless the state court's adjudication of the

13   claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

14   clearly established federal law, as determined by the Supreme Court of the United States; or (2)

15   resulted in a decision that was based on an unreasonable determination of the facts in light of the

16   evidence presented in state court.  See 28 U.S.C. 2254(d).  If a state court's decision does not

17   meet the criteria set forth in § 2254(d), a reviewing court must conduct a *de novo* review of a

18   petitioner's habeas claims.  See Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).

19          As a threshold matter, this Court must "first decide what constitutes 'clearly established

20   Federal law, as determined by the Supreme Court of the United States.'"  Lockyer v. Andrande,

21   538 U.S. 63, 71 (2003) (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law'

22   under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court

23   at the time the state court renders its decision.'"  Id. (citations omitted).  Under the unreasonable

24   application clause, a federal habeas court making the unreasonable application inquiry should ask

25   whether the state court's application of clearly established federal law was "objectively

26   unreasonable."  See Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may

                                                      4

1  not issue the writ simply because the court concludes in its independent judgment that the

2  relevant state court decision applied clearly established federal law erroneously or incorrectly.

3  Rather, that application must also be unreasonable." Id. at 411.  Although only Supreme Court

4  law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in

5  determining whether a state court decision is an objectively unreasonable application of clearly

6  established federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only

7  the Supreme Court's precedents are binding . . . and only those precedents need be reasonably

8  applied, we may look for guidance to circuit precedents.").

9       The first step in applying AEDPA's standards is to "identify the state court decision that

10  is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

11  When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

12  last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  The last

13  reasoned state court decision was from the California Court of Appeal, Third Appellate District.

## V.  PETITIONER'S CLAIMS FOR REVIEW

15       A.  Claim I

16       In Claim I, Petitioner argues that his rights under the state and federal constitutions were

17  violated when the trial court denied his Wheeler[2]/Batson[3] motion.  First, to the extent that

18  Petitioner alleges a violation of the California Constitution, his claim is not cognizable on federal

19  habeas review.  See 28 U.S.C. § 2254(a); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("In

20  conducting habeas review, a federal court is limited to deciding whether a conviction violated the

21  Constitution, laws, or treaties of the United States.").

22       Petitioner argues that the prosecution struck two jurors [M and L], because they were

23  African-American.  The following colloquy took place between the Deputy District Attorney and

---

25       [2] People v. Wheeler, 22 Cal. 3d 258, 148 Cal. Rptr. 890, 583 P.2d 748 (1978).

26       [3] Batson v. Kentucky, 476 U.S. 79 (1986).

5

prospective juror M during the voir dire proceedings:

> Q:  Ms. [M], you were a teacher for a while at St. Patrick's School,
> right?
> A:  Uh-huh.
> Q:  That's the one attached to Saint Rose over on Franklin?
> A:  Yes.  I work with toddlers 14 months to a day before their third
> birthday.
> Q:  When were you a teacher at Saint Patrick's?
> A:  When?
> Q:  Yes.
> A:  I'm a teacher now, program manager and teacher.
> Q:  What ages do you teach?
> A:  Toddlers.
> Q:  Oh, okay, I understand.  And is Monsignor Cavanaugh still sort
> of running the whole deal there?
> A:  Yes.
> Q:  Do you work with him some?
> A:  No, he comes to our site and takes a tour every now and then.
> Q:  Did you previously work as a human services supervisor?
> A:  No, that's my husband.
> Q:  Okay.  And what does he do?
> A:  He is a supervisor down at the Department of Human
> Assistance.

(Reporter's Supp. Tr. at p. 14-15.)  Prospective juror M explained that the day care center

provides subsidized child care to low-income families.  (See Reporter's Aug. Tr. at p. 156.)

Prospective juror L told the court that she used to be a secretary for a pro bono office in Alabama

which helped indigent clients in family law court.  (See Reporter's Augmented Tr. at p. 121.)

The prosecutor struck both prospective jurors M and L during the voir dire proceedings.

(See Reporter's Supp. Tr. at p. 66, 67.)

On June 17, 2004, the trial court conducted a Batson hearing to examine the prosecutor's

rationale for striking jurors M and L.  The following colloquy took place at that hearing:

> THE COURT:  Mr. Soloman, I think by making the motion, the
> defense has made a prima fascia [sic] case that these individuals
> are members of a cognizable group.  And I think based on what I
> have heard, I would like to hear from you as to why you challenge
> that.
>
> MR. SOLOMAN:  Thank you.  Both [M] and [L], as well as two
> other jurors that were in the box in this case, came from
> backgrounds in which they dealt with either indigent individuals or

6

worked in a group home foster care setting.

[M] indicated that she works for Saint Patrick's School over on Florin Road which has associated with – she is a program manager there, a foster care and a group home.  I am very much familiar with Saint Patrick's School and Monsignor Cavanaugh who oversees the Saint Patrick's schools.  I have had numerous personal experiences with Monsignor Cavanaugh and other staff at Saint Patrick's.

In addition to that, [M]'s husband is a supervisor with the human assistance division.  In addition to that, in comparing that with [L], [L] worked for a number of years for a pro bono indigent family law office and likewise dealt with individuals who were indigent, as well as [S] . . . who I also challenged.  The reason for that, along the same vein, she was a group home counselor for a number of years.

It is the People's position that it is my fear those individuals would identify with these defendants and identify with people who may be out on the streets or living in the streets and would be sympathetic toward them, and given their experiences in these settings either with group homes or as counselors or working with indigent individuals, that there may be some identification with that juror with these defendants.  To avoid that risk, I have challenged all jurors who come from that type of background.

And in fact, I would have challenged [H], who also indicated that she worked for Child Action, which is a subsidized child center, if Mr. Haydn-Myer had not done it, even notwithstanding the fact that she has a relative who is a judge here.  Those are my reasons for the challenges I have used.

THE COURT:  When you say "the indigency issue," can you tell me what you mean?

MR. SOLOMAN:  These are people – my understanding is that they work with individuals who could come from or typically would come from socioeconomic backgrounds that leave them unable to pay for services.  And it is my experience in working in gangs for a number of years that typically the individuals who are involved in street gangs come from, a lot of times, this same type of setting.

Because these jurors have worked with individuals in the group homes, foster care, human assistance, subsidized daycare, all those things, in my mind, those jurors have too close of an association with the individuals and the backgrounds from which they may perceive these defendants have come.  And I don't want them in a position where they are identifying these defendants with other kids that they have worked with and thinking, geez, I wonder what made them go wrong?  I feel bad for them, those types of feelings of sympathy.

In fact, in my questioning, I asked one of the jurors about that very issue, about that sympathy issue and identifying possibly these defendants with individuals she has worked with in a group home.

1        For those reasons, I have challenged those jurors . . . .

2        THE COURT:  The Court is satisfied that the challenges in this
         case were made for genuine nondiscriminatory reasons.  I think
3        that Mr. Soloman's record that he has made that he is very
         concerned that people who have had these kinds of occupations,
4        either currently or in the past, may unduly identify with the
         defendants in this case, rooting for the underdog, so to speak.  And
5        I find that Mr. Soloman is believable.  I think his explanation is
         credible.  I make a finding of fact that I find his reasons fo
6        excusing these jurors is credible, and I am going to deny the
         motion.

7

8   (Reporter's Supp. Tr. at p. 71-74.)

9        The California Court of Appeal analyzed this Claim on the merits on direct appeal and

10  stated the following:

11       Wilson contends the trial court erred by ruling that the prosecution
         did not use peremptory challenges in an unconstitutionally
12       discriminatory way.  Lopez joins in the contention.  We conclude
         that the trial court did not err.
13
         "[P]eremptory challenges may not be used to remove prospective
14       jurors solely . . . because they are members of an identifiable group
         distinguished on racial, religious, ethnic or similar grounds."
15       (People v. Johnson (1989) 47 Cal.3d 1194, 1215 (Johnson).)
         When a defendant believes the prosecutor is using peremptory
16       challenges to remove prospective jurors solely on the basis of a
         presumed group bias, the defendant must timely object and make a
17       prima facie showing of unlawful discrimination.  (People v.
         Wheeler (1978), 22 Cal.3d 258, 280 (Wheeler); see also Batson v.
18       Kentucky (1986) 476 U.S. 79, 96-97 [90 L.Ed.2d 69, 87-88]
         (Batson).)
19
         "Once a prima facie case has been shown, the burden shifts to the
20       other party to come forward with an explanation that demonstrates
         a neutral explanation related to the particular case to be tried."
21       (Johnson, supra, 47 Cal.3d at p. 1216.)  As long as the proffered
         nondiscriminatory justification is genuine and neutral, it "may
22       range from the obviously serious to the apparently trivial, from the
         virtually certain to the highly speculative."  (Wheeler, supra, 22
23       Cal.3d at p. 275.)

24       "If the trial court makes a 'sincere and reasoned effort' to evaluate
         the nondiscriminatory justifications offered, its conclusions are
25       entitled to deference on appeal.  In such circumstances, an
         appellate court will not reassess good faith by conducting its own
26       comparative juror analysis.  Such an approach would undermine

8

the trial court's credibility determinations and would discount "'the variety of [subjective] factors and considerations,'" including 'prospective jurors' body language or manner of answering questions,' which legitimately inform a trial lawyer's decision to exercise peremptory challenges. [Citations.]"  (People v. Montiel (1993) 5 Cal.4th 877, 909.)

"[T]he proper focus of a Batson/Wheeler inquiry, of course is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, not on the objective *reasonableness* of those reasons."  (People v. Reynoso (2003) 31 Cal.4th 903, 924 (Reynoso), italics in original.)  "We give great deference to the trial court in distinguishing bona fide reasons from sham excuses."  (People v. Turner (1994) 8 Cal.4th 137, 165.)  The proper function of review is to determine whether the trial court's conclusion, that the prosecutor's subjective race-neutral reasons for exercising the peremptory challenges at issue were sincere and that defendants failed to sustain their burden of proving unlawful discriminatory intent, is supported by the record when considered under the applicable deferential standard of review.  (Reynoso, supra, at p. 924.)

During jury selection, the prosecution used peremptory challenges to excuse two African-American women as prospective jurors. When both defendants objected on Wheeler/Batson grounds, the trial court found the defendants had made a prima facie case and asked the prosecutor for an explanation.  The prosecutor responded that he excused the two prospective jurors because of their backgrounds in working with indigent people and foster care, which in the prosecutor's opinion could indicate they would sympathize with the defendants.

Prospective juror L. had been arrested a year before for driving under the influence.  She felt she was treated fairly.  She was formerly a secretary in a pro bono legal office in Alabama, giving assistance to indigent clients in family court matters.  She currently works for a state agency that regulates private post-secondary schools.

Prospective juror M, is a program manager and teacher at St. Patrick's Day Care Center in Sacramento, which provides subsidized day care for low-income families and foster care.  She formerly taught in an after-school program.

The prosecutor stated that he believed prospective jurors L. and M. would be sympathetic towards the defendants because of the defendants' gang affiliation and the tendency of gangs to include members who come from lower socioeconomic backgrounds and are unable to pay for services, such as day care and legal representation.  He noted that he challenged all jurors with that type of background.  The prosecutor explained:  "I don't want them

9

[the jurors] in a position where they are identifying these defendants with other kids that they have worked with and thinking, geez, I wonder what made them go wrong?  I feel bad for them, those types of feelings of sympathy."

The trial court found the prosecutor's explanation was "genuine" and "credible":  "I think that [the prosecutor's] record that he has made that he is very concerned that people who have had these kinds of occupations, either currently or in the past, may unduly identify with the defendants in this case, rooting for the underdog, so to speak."  The court therefore denied the motion.

On appeal, the defendants assert the prosecutor's explanation was "pretextual" because the trial court instructed the jury it could not let sympathy interfere with its decision.  This assertion is frivolous. The prosecutor is entitled to use peremptory challenges for any reason not prohibited by the constitution.  Here, the reason given was proper and was found to be credible by the trial court.  The defendants also complain that the two prospective jurors said nothing to betray possible sympathy for the defendants, and sympathy for gang members does not logically flow from the work engaged in by the prospective jurors.  This argument disregards the proper Wheeler/Batson standard which commands the trial court and us to consider the subjective genuineness, not the objective reasonableness, of the prosecutor's nondiscriminatory reasons for excusing prospective jurors.

The trial court gave the Wheeler/Batson motion full consideration, asking for an explanation for the benefit of the defendants and the record.  While we accord great deference to the trial court's decision, it requires no stretch of reasoning at all to conclude the trial court did not err in denying the motion.

(Slip Op. 5-9.)

In this case, Petitioner argues that his constitutional rights were violated when the prosecutor dismissed M and L because neither "said anything during vior [sic] dire to give any hint that they were sympathetic to the petitioner's, nor did the prosecutor question them about this point."  (Pet'r's Pet. at p. 6.)

To establish a Batson claim, the defendant must first make a prima facie showing that a challenge was made on an impermissible basis, such as race.  476 U.S. at 96; see also Johnson v. California, 545 U.S. 162, 170-71 (2005).  Where the defendant has made a prima facie showing of discrimination, the burden shifts to the prosecutor to offer a race-neutral reason for the

10

challenge that relates to the case.  See id. at 168.  Where the prosecutor offers a race-neutral

explanation for the challenge, the trial court decides whether the defendant has proved the

prosecutor's motive for the challenge was purposeful racial discrimination.  See id.; Batson, 476

U.S. at 98.  The opponent of the strike has the ultimate burden of persuasion regarding racial

motivation.  See Purkett v. Elem, 514 U.S. 765, 768 (1995) (per curiam).  It is the third step of

the Batson inquiry that is at issue in this case.  An en banc panel of the Ninth Circuit in Kesser v.

Cambra, 465 F.3d 351, 359-60 (9th Cir. 2006) (en banc) discussed at length the requirements of a

court in analyzing the third step of a Batson issue:

> At this stage, "the trial court determines whether the opponent of
> the strike has carried his burden of proving purposeful
> discrimination."  Purkett, 514 U.S. at 768.  Although the burden
> remains with the defendant to show purposeful discrimination, the
> third step of Batson primarily involves the trier of fact.  After the
> prosecution puts forward a race-neutral reason, the court is
> required to evaluate "the persuasiveness of the justification."  Id.
> To accept a prosecutor's stated nonracial reasons, the court need
> not agree with them.  The question is not whether the state reason
> represents a sound strategic judgment, but "whether counsel's race-
> neutral explanation for a peremptory challenge should be
> believed."  Hernandez v. New York, 500 U.S. 352, 365 (1991)
> (plurality opinion).  "It is true that peremptories are often the
> subjects of instinct," and that "it can sometimes be hard to say
> what the reason is."  Miller-El, 125 S.Ct. at 2332.  "But when
> illegitimate grounds like race are in issue, a prosecutor simply has
> got to state his reasons as best he can and stand or fall on the
> plausibility of the reasons he gives."  Id.  "While subjective factors
> may play a legitimate role in the exercise of challenges, reliance on
> such factors alone cannot overcome strong objective indicia of
> discrimination. . . ."  Burks v. Borg, 27 F.3d 1424, 1429 (9th Cir.
> 1994).
>
> The trier of fact may not turn a blind eye to purposeful
> discrimination obscured by race-neutral excuses.  "[T]he
> prosecutor must give a 'clear and reasonably specific' explanation
> of his 'legitimate reasons' for exercising the challenges."  Batson,
> 476 U.S. at 98 n. 20 (quoting Tex. Dep't of Cmty. Affairs v.
> Burdine, 450 U.S. 248, 258 (1981)).  "A Batson challenge does not
> call for a mere exercise in thinking up any rational basis."  Miller-
> El, 125 S.Ct. at 2332.  Reasons must be "related to the particular
> case to be tried."  Batson, 476 U.S. at 98.  "[I]mplausible or
> fantastic justifications may (and probably will) be found to be
> pretexts for purposeful discrimination."  Purkett, 514 U.S at 768.

The court need not accept any proffered rationale.  We have recognized that "[w]hen there is reason to believe that there is a racial motivation for the challenge, neither the trial courts nor we are bound to accept at face value a list of neutral reasons that are either unsupported in the record or refuted by it."  Johnson, 3 F.3d at 1331.  The court must evaluate the record and consider each explanation within the context of the trial as a whole because "'[a]n invidious discriminatory purpose may often be inferred from the totality of the relevant facts.'"  Hernandez, 500 U.S at 363, 111 S.Ct. 1859 (quoting Washington v. Davis, 426 U.S. 229, 242 (1976)); see also Miller-El, 125 S.Ct. At 2324 (noting that Batson requires inquiry into "'the totality of the relevant facts' about a prosecutor's conduct" (quoting Batson, 476 U.S. at 94, 106 S.Ct. 1712)); Batson, 476 U.S. at 93, 106 S.Ct. 1712 ("In deciding if the defendant has carried his burden of persuasion, a court must undertake a sensitive inquiry into such circumstantial and direct evidence as may be available." (internal quotation marks omitted)).  A court need not find all nonracial reasons pretextual in order to find racial discrimination.  "[I]f a review of the record undermines the prosecutor's stated reasons, or many of the proffered reasons, the reasons may be deemed a pretext for racial discrimination."  Lewis v. Lewis, 321 F.3d 824, 830 (9th Cir. 2003); see also United States v. Chinchilla, 874 F.2d 695, 699 (9th Cir. 1989) ("Thus, the court is left with only two acceptable bases for the challenges. . . . Although these criteria would normally be adequately 'neutral' explanations taken at face value, the fact that two of the four proffered reasons do not hold up under judicial scrutiny militates against their sufficiency.").

See also Green v. LaMarque, 532 F.3d 1028, 1030 (9th Cir. 2008) (discussing the court's inquiry at the third step of a Batson analysis).

"'If a prosecutor's proffered reason for striking a [minority] panelist applies just as well to an otherwise - similar [nonminority] who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at Batson's third step.'"  Kesser, 465 F.3d at 360 (quoting Miller-El, 125 S.Ct. at 2325).  This inquiry is called comparative juror analysis.  In Kesser, 465 F.3d at 361, the Ninth Circuit explained that Miller-El "made clear that the comparative analysis is required even when it is was not requested or attempted in the state court."

In Petitioner's case, the state courts failed to undergo a comparative juror analysis inquiry in resolving Petitioner's Batson claim.  Respondent argues that the trial court's credibility

1   determination with respect to the prosecutor was not unreasonable, that the reasons for striking

2   jurors M and L were clear and without respect to the their racial backgrounds and that the state

3   court factual findings are presumed to be correct absent clear and convincing evidence pursuant

4   to 28 U.S.C. § 2254(e)(1).  However, in this case, the state court failed to properly determine

5   whether the Petitioner had established purposeful discrimination when it failed to undergo a

6   comparative juror analysis.  See Green, 532 F.3d at 1031.  Where the state court has

7   unreasonably applied clearly established federal law with respect to the comparative juror

8   analysis, the federal court's determination as to whether the prosecutor's reason for rejecting

9   African-American jurors was pretextual must be made on a *de novo* basis.  Paulino v. Harrison,

10  542 F.3d 692, 698 (9th Cir. 2008); Frantz v. Hazey, 533 F.3d 724, 734-35 (9th Cir. 2008) (en

11  banc); Green, 532 F.3d at 1031; Hill v. Malsi, Civ. No. 06-5367, 2010 WL 4027720, at * 9 (C.D.

12  Cal. Aug. 13, 2010) (applying *de novo* review to a Batson claim where the state courts did not

13  undergo a comparative juror analysis), report and recommendation adopted by, 2010 WL

14  3928868 (C.D. Cal. Oct. 5, 2010); Love v. Yates, 586 F. Supp. 2d 1155, 1170 (N.D. Cal. 2008)

15  (same); Lewis v. Runnels, Civ. No. 03-1410, 2008 WL 4821751, at *7 (E.D. Cal. Nov. 4, 2008)

16  (same).

17         A *de novo* review of the record reveals that the same reason given by the prosecutor why

18  he struck both jurors M and L is supported by the record and is race-neutral.  See, e.g., J.E.B. v.

19  Alabama et rel. T.B., 511 U.S. 127, 142 n.14 (1994) (suggesting that peremptory challenges

20  based on status or occupation do not raise the same level of concern as those based on race or

21  gender); Hall v. Leubbers, 341 F.3d 706, 713 (8th Cir. 2003) ("Occupation is a permissible

22  reason to defend against a Batson challenge, and being a social worker could be a legitimate

23  basis to strike a prospective juror."); United States v. Thompson, 827 F.2d 1254, 1260 (9th Cir.

24  1987) ("[e]xcluding jurors because of their profession . . . is wholly within the prosecutor's

25  prerogative").

26         Additionally, comparative juror analysis does not necessarily support Petitioner's Batson

13

1  claim in this case.  Review of the voir dire transcript does not establish that a member of the jury

2  had a similar occupation (or former occupation) to that of prospective jurors M and L.  It does

3  not indicate that a juror worked with the indigent and/or as a counselor to people from a low

4  socioeconomic status such that they might sympathize with Petitioner which was the stated non-

5  racial reason given by the prosecutor why he struck prospective jurors M and L.  Petitioner had

6  the burden to show purposeful racial discrimination at the third step of the <u>Batson</u> inquiry.  In

7  this case, Petitioner failed to show purposeful discrimination.  <u>See</u> <u>Johnson</u>, 545 U.S. at 168.

8  Petitioner's <u>Batson</u> claim does not merit granting federal habeas relief.

9       B.  Claim II

10      In Claim II, Petitioner asserts that there was insufficient evidence to support the jury's

11  finding of the gang enhancements for each attempted murder.  The Petitioner specifically argues

12  that there was insufficient evidence of his specific intent as is vrequired for a finding under

13  California Penal Code § 186.22(b)(1).

14      The Due Process Clause of the Fourteenth Amendment "protects the accused against

15  conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the

16  crime with which he is charged."  <u>In re Winship</u>, 397 U.S. 358, 364 (1970).  There is sufficient

17  evidence to support a conviction, if, "after viewing the evidence in the light most favorable to the

18  prosecution, any rational trier of fact could have found the essential elements of the crime beyond

19  a reasonable doubt."  <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979).  "[T]he dispositive question

20  under <u>Jackson</u> is 'whether the record evidence could reasonably support a finding of guilt beyond

21  a reasonable doubt.'"  <u>Chein v. Shumsky</u>, 373 F.3d 978, 982 (9th Cir. 2004) (quoting <u>Jackson</u>,

22  443 U.S. at 318).  A petitioner for a federal writ of habeas corpus "faces a heavy burden when

23  challenging the sufficiency of the evidence used to obtain a state conviction on federal due

24  process grounds."  <u>Juan H. V. Allen</u>, 408 F.3d 1262, 1274 (9th Cir. 2005).  In order to grant the

25  writ, the habeas court must find that the decision of the state court reflected an unreasonable

26  application of <u>Jackson</u> and <u>Winship</u> to the facts of the case.  <u>See</u> <u>id.</u>

1      A federal habeas court determines sufficiency of the evidence in reference to the

2   substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

3   324 n.16; Chein, 373 F.3d at 983.  California Penal Code § 186.22(b)(1) states that:

> Except as provided in paragraphs (4) and (5), any person who is
> convicted of a felony committed for the benefit of, at the direction
> of, or in association with any criminal street gang, with the specific
> intent to promote, further, or assist in any criminal conduct by gang
> members, shall, upon conviction of that felony, in addition and
> consecutive to the punishment prescribed for the felony or
> attempted felony of which he or she has been convicted, be
> punished as follows:
>
> (A) Except as provided in subparagraphs (B) and (C), the person
> shall be punished by an additional term of two, three, or four years
> at the court's discretion.
>
> (B) If the felony is a serious felony, as defined in subdivision (c) of
> Section 1192.7, the person shall be punished by an additional term
> of five years.
>
> (C) If the felony is a violent felony, as defined in subdivision (c) of
> Section 667.5, the person shall be punished by an additional term
> of 10 years.

In this case, the California Court of Appeal determined that there was sufficient evidence to

support the gang enhancements.  Specifically, the court explained:

> Wilson and Lopez both argue that the evidence was insufficient to
> support the gang enhancement because there was no evidence that
> the crimes were committed to enable or further *other* criminal
> activity by the gang.  The argument is without merit because it
> relies on an erroneous interpretation of the gang enhancement
> statute.
>
> Penal Code section 186.22, subdivision (b) provides for an
> enhancement when a person "is convicted of a felony committed
> for the benefit of, at the direction of, or in association with any
> criminal street gang, with the specific intent to promote, further, or
> assist in any criminal conduct by gang members . . . ."  Wilson and
> Lopez assert the last part of the statute quoted above requires that
> the crime be committed to enable or further *other* criminal activity
> by the gang.
>
> There is no requirement in section 186.22, subdivision (b), that the
> defendant's intent to enable or promote criminal endeavors by gang
> members must relate to criminal activity apart from the offense

1        defendant commits.  To the contrary, the specific intent required by
2        the statute is "to promote, further or assist in *any* criminal conduct
        by gang members."  (Pen. Code, § 186.22, subd. (B), italics added.)
3        By its plain language, the statute requires a showing of specific
        intent to promote, further, or assist in '*any* criminal conduct by
4        gang members,' rather than *other* criminal conduct.  (§ 186.22,
        subd. (b) (1), italics added.)"  <u>People v. Romero</u> (2006) 140
5        Cal.App.4th 15, 19.)  Therefore, defendants' own crimes qualified
        as the gang-related criminal activity.  No further evidence on this
6        element was necessary.

7  (Slip Op. at p. 9-10.)  With respect to the gang enhancement for the Fielding attempted murder,

8  the California Court of Appeal stated that "the evidence supports the inference that Wilson and

9  Lopez were out doing the work of the gang on the night of the incidents – intimidating and

10  shooting Ciancio and doing likewise with Fielding, also trying to eliminate a witness that could

11  place them together and in the area of the Ciancio shooting.  That these acts were done for the

12  benefit of their gang is a conclusion easily drawn from their gang membership and their

13  activities, which were typically the activities of a gang member."  (Slip Op. at p. 14-15.)

14        There has been a divergence of opinion between the California state courts and the Ninth

15  Circuit regarding what constitutes sufficient evidence to sustain a gang enhancement under §

16  186.22(b)(1).  The Ninth Circuit set forth the relevant standard for federal habeas courts in

17  determining such a sufficiency of the evidence claim under section 186.22(b)(1) in <u>Garcia v.</u>

18  <u>Carey</u>, 395 F.1099 (9th Cir. 2005) and <u>Briceno v. Scribner</u>, 555 F.3d 1069 (9th Cir. 2009).

19  Under <u>Garcia</u>/<u>Briceno</u>, a prosecutor had to satisfy two prongs for there to be sufficient evidence

20  to warrant a finding of a gang enhancement pursuant to § 186.22(b)(1).  First, the evidence must

21  have showed that the defendant committed the felony "for the benefit of, at the discretion of, or

22  in association with [a] criminal street gang."  <u>Briceno</u>, 555 F.3d at 1078 (quoting Cal. Penal Code

23  § 186.22(b)(1)).  Second, the evidence must have showed that the defendant committed the crime

24  "with the specific intent to promote, further, or assist in any criminal conduct by gang members."

25  <u>Id.</u> (quoting Cal. Penal Code § 186.22(b)(1)).  As noted by the Ninth Circuit, it was important

26  that these two requirements were kept separate and not merged.  Furthermore, the second prong

1    inquiry was not satisfied by evidence of mere membership in a criminal street gang alone.

2    See id. (citing Garcia, 395 F.3d at 1102-03 & n.5).

3          In Garcia, the court found that:

4              There is nothing in this record, however, that would support an
               inference that Garcia robbed Bojorquez with the specific intent to
5              facilitate other criminal conduct by the E.M.F.  The evidence
               indicates that Garcia was a gang member and that he robbed
6              Bojorquez in an area known to be in the heart of the gang's "turf."
               Detective Hernandez, the gang expert, testified that the gang was
7              "turf oriented," and he described three robberies committed by
               E.M.F. members in El Monte during the few months prior to
8              Garcia's offense.  But there is no evidence indicating that this
               robbery was committed with the specific purpose of furthering
9              other gang criminal activity, and there is nothing inherent in the
               robbery that would indicate that it furthers some other crime.
10             There is nothing on the record that connects the "turf-orientated"
               nature of the gang with the commission of robberies generally, or
11             more importantly, with the commission of this robbery in
               particular.   There is no testimony that protective of turf enables
12             any other kind of criminal activity of the gang.  The expert's
               testimony is singularly silent on what criminal activity of the gang
13             was furthered or intended to be furthered by the robbery of
               Bojorquez.

14

15   Id. at 1103.  Thus, the Ninth Circuit found that there was a lack of evidentiary support for the

16   specific intent to further other gang criminal activity.  See id. at 1004.

17         In Briceno, the Ninth Circuit reaffirmed Garcia despite the fact that the California

18   Appellate Court had held that Garcia misinterpreted California law.  As this court stated recently,

19   "every California Court of Appeal decision since Briceno has agreed that Briceno and Garcia

20   misinterpreted California law with respect to whether the crime must be committed in

21   furtherance of some other criminal activity, and declined to follow them."  Lopez v. Walker, Civ.

22   No. 08-0598, 2010 WL 1558953, at *12 n. 49 (E.D. Cal. April 19, 2010).

23         Conversely, California state courts have interpreted § 186.22(b)(1) differently than the

24   Ninth Circuit.  In People v. Vazquez, 178 Cal. App. 4th 347, 353-54, 100 Cal. Rptr. 3d 351

25   (2009), the California Court of Appeal explained the divergent opinions between the Ninth

26   Circuit and the California state courts on this issue:

                                             17

In <u>Briceno</u>, <u>supra</u>, and <u>Garcia</u>, <u>supra</u>, the Ninth Circuit held that the specific intent requirement of section 186.22, subdivision (b) is not satisfied by evidence of a defendant's gang membership alone, and instead requires some evidence, aside from a gang expert's "generic testimony," that supports an inference that the defendant committed the crime "'with the specific intent to facilitate other criminal conduct by the [gang].'" (<u>Briceno</u>, <u>supra</u>, 555 F.3d at p. 1079, quoting <u>Garcia</u>, <u>supra</u>, 395 F.3d at p. 1103.)  Among other things, according to the Ninth Circuit, the statute requires evidence describing "'what criminal activity of the gang was . . . intended to be furthered'" by the crime.  (<u>Id.</u>, quoting <u>Garcia</u>, <u>supra</u>, at p. 1103.)

While our Supreme Court has not yet reached this issue, numerous California courts of appeal have rejected the Ninth Circuit's reasoning.  As our colleagues noted in <u>People v. Romero</u> (2006) 140 Cal.App.4th 15, 19, 43 Cal.Rptr.3d 862:  "By its plain language, the statute requires a showing of specific intent to promote, further, or assist in '*any other* criminal conduct (§ 186.22, subd. (b)(1), italics added.)"  Thus, if substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members.  (<u>Id.</u> at pp. 19-20, 43 Cal.Rptr.3d 862.)

In May 2010, the Ninth Circuit requested that the California Supreme Court answer several questions in <u>Emery v. Clark</u>, 604 F.3d 1102 (9th Cir. 2010) in light of the conflicting interpretations of the California gang enhancement statute in the federal and state courts.  Among the questions that the Ninth Circuit requested that the California Supreme Court answer was whether "California's street gang enhancement statute, in particular the element of 'specific intent to promote, further, or assist in any criminal conduct by gang members' in California Penal Code section 186.22(b)(1), require proof that the defendant specifically intended to promote, further, or assist in *other* criminal gang activity, apart from the offense of conviction?"  <u>Id.</u> at 1103 (footnote and citations omitted).

On June 23, 2010, the California Supreme Court granted the request for certification but deferred further action in the <u>Emery</u> matter pending consideration of related issues in another case, specifically <u>People v. Albillar</u>, No. S163905.  On December 20, 2010, the California Supreme Court decided <u>People v. Albillar</u>, No. S163905, 2010 WL 5140768 (Cal. Dec. 20,

1   2010).  In <u>Albillar</u>, the California Supreme Court also noted the conflict between the California

2   state and federal courts with respect to the interpretation of section 186.22.(b)(1).  <u>See id.</u> at *13.

3   The court expressly rejected the Ninth Circuit's interpretation of the statute by stating that:

> we reject the Ninth Circuit's attempt to write additional
> requirements into the statute.  It provides an enhanced penalty
> where the defendant specifically intends to 'promote, further, or
> assist in any criminal conduct by gang members.' (§ 186.22, subd.
> (b)(1).)  There is no statutory requirement that this 'criminal
> conduct by gang members' be distinct from the charged offense, or
> that the evidence establish specific crimes the defendant intended
> to assist his fellow gang members in committing.

<u>Id.</u>  Ultimately, the California Supreme Court held that:

> We . . . find that the scienter requirement in section 186.22(b)(1)-
> i.e., "the specific intent to promote, further or assist in any criminal
> conduct by gang members" - is unambiguous and applies to *any*
> criminal conduct, without a further requirement that the conduct be
> "apart from" the criminal conduct underlying the offense of
> conviction sought to be enhanced.
>
> A similar analysis disposes of the related argument, advanced by
> all three defendants, that section 186.22(b)(1) requires the specific
> intent to promote, further, or assist a *gang-related* crime.  The
> enhancement already requires proof that the defendant commit a
> gang-related crime in the first prong-i.e., that the defendant be
> convicted of a felony for the benefit of, at the direction of, or in
> association with a criminal street gang . . . There is no further
> requirement that the defendant act with the specific intent to
> promote, further, or assist a *gang*; the statute requires only the
> specific intent to promote, further, or assist criminal conduct by
> gang members.

<u>Id.</u> at *13.  The court concluded by stating that, "[i]n sum, if substantial evidence establishes that

the defendant intended to and did commit the charged felony with known members of a gang, the

jury may fairly infer that the defendant had the specific intent to promote, further or assist

criminal conduct by those gang members."  <u>Id.</u> at * 14.  The court did note however that not

every crime that is committed by gang members is related to a gang.  <u>See id.</u> at * 8.

    A federal court interpreting state law is bound by the decisions of the highest state court.

<u>See</u> <u>Vernon v. City of Los Angeles</u>, 27 F.3d 1385, 1391 (9th Cir. 1994).  As the California

1  Supreme Court has now spoken on what constitutes sufficient evidence under section

2  186.22(b)(1), the standard set forth in <u>Albillar</u> applies in this case rather than the standard set

3  forth by the Ninth Circuit in <u>Garcia</u> and <u>Briceno</u>.  Petitioner received gang enhancements for the

4  attempted murders of both Ciancio and Fielding.

5        Petitioner argues that there was insufficient evidence to support the gang enhancements

6  including the failure of the prosecution to prove the requisite specific intent for both gang

7  enhancements.  With respect to the gang enhancement for the Ciancio attempted murder,

8  Petitioner's is not entitled to federal habeas relief on his insufficiency claim.  The attempted

9  murder of Ciancio was gang related because it was committed in association with the gang and

10  was committed for the benefit of the gang and Petitioner had the specific intent to promote and/or

11  assist criminal conduct by the gang.

12        The gang expert testified that the attempted murder of Ciancio was done for the benefit of

13  the gang.  He testified that Petitioner and Lopez "claimed what gang they are so they will get

14  respect from the neighborhood, the intimidation from the neighborhood.  Also, shooting

15  somebody in that neighborhood will also put fear and intimidation not only to the person that

16  they're shooting, but to that neighborhood in general."  (Reporter's Tr. at p. 911.)  Also, the fact

17  that Ciancio told Petitioner and Lopez that he was not a gang banger had no effect on the benefit

18  supplied to their gang "because either they believe he's a gang member or they're just looking to

19  pick a fight and enhance their reputations."  (<u>Id.</u>)

20        Secondly, the attempted murder of Ciancio was committed for the benefit and promotion

21  of the East Side Pirus.  Section 186.22(b)(1) only requires that the prosecution show that the

22  defendant had the specific intent to promote, further, or assist in any criminal conduct by gang

23  members - including the current offenses - and not merely other criminal conduct by gang

24  members.  <u>See</u> <u>Albillar</u>, 2010 WL 5140768, at *12.  In this case, the gang expert testified that

25  gangs are concerned about their turf or territory so that they could sell narcotics and to control the

26  neighborhood with fear.  (<u>See</u> Reporter's T. at p. 884.)  The "turf-oriented" nature of the gang in

1    this case was connected with the commission of the crime against Ciancio.  When Petitioner

2    confronted Ciancio on the street he asked him where he was from.  (See id. at p. 121.)  When

3    Ciancio responded that he did not gang bang, Petitioner retorted with "Piru" and then asked

4    Ciancio whether he was a "South Side Crip."  (Id.)  As noted by the gang expert at trial, when a

5    gang member sees someone walking in their "hood" there will most often "be a kind of a

6    challenge with where are you from, what do you claim."  (Id. at 896.)  The reasoning behind this

7    question is so that the gang member can ascertain what set and neighborhood the person comes

8    from.  (See id.)  The expert continued by noting that if the individual says that he is not involved

9    in a gang that the gang member will try and establish dominance over that person by possibly

10   assaulting the person or making more threats to make the individual back down.  (See id. at 897.)

11   The expert stated that when a gang member is disrespected, his response will be disproportionate

12   and will resort to violence.  (See id. at p. 898.)  The evidence in the record connected the "turf-

13   oriented" nature of the gang to the crime committed against Ciancio.  The offense of attempting

14   to murder Ciancio was committed for the benefit of the gang.  As Albillar made clear, where

15   substantial evidence established that the defendant intended to and did commit a charged felony

16   with known members of a gang, the jury may fairly infer that the defendant had the specific

17   intent to promote, further or assist criminal conduct by those gang members.  Thirdly, Petitioner

18   committed the attempted murder with a fellow gang member (Lopez).  See Albillar, 2010 WL

19   5149068, at *4 ("if substantial evidence establishes that the defendant intended to and did

20   commit the charged felony with known members of a gang, the jury may fairly infer that the

21   defendant had the specific intent to promote, further or assist criminal conduct by those gang

22   members").  For these reasons, Petitioner's insufficiency claim with respect to the Ciancio gang

23   enhancement does not warrant granting Petitioner federal habeas relief.

24          Similar reasons also warrant denying Petitioner federal habeas relief on his insufficiency

25   argument with respect to the Fielding gang enhancement.  The gang expert testified that

26   committing the crime of shooting someone puts fear into the neighborhood that benefits the gang.

1  (See Reporter's Tr. at 911-12.)  He also testified that witness intimidation is a common tactic

2  used by gangs.  (See id. at p. 885.)  Thus, there was sufficient evidence in the record that

3  Petitioner committed the attempted murder for the benefit of the gang and/or in association with

4  the gang along with the specific intent to promote or assist the criminal conduct by the gang.

5  Petitioner committed the charged felony of attempting to murder Fielding with another known

6  member of his gang, the East Side Pirus.  The jury could also fairly infer that Petitioner "had the

7  specific intent to promote, further, or assist criminal conduct by those gang members," see, e.g.,

8  Albillar, 2010 WL 5140768, at *14, specifically with Lopez when Petitioner shot Fielding.

9  Based on the standard set forth in Albillar, Petitioner's insufficiency argument with respect to the

10  Fielding attempted murder also does not warrant granting federal habeas relief.

11        C.  Claim III

12        In Claim III, Petitioner argues that there was insufficient evidence to support the finding

13  that the attempted murder of Ciancio was deliberate and premeditated.  The California Court of

14  Appeal analyzed this argument on direct appeal and stated the following:

15        Wilson and Lopez contend the evidence was insufficient for the
          jury to conclude they premeditated and deliberated with respect to
16        the attempted murder of Ciancio.  The contention is without merit.

17        The Supreme Court recently summarized its jurisprudence in this
          area:  "'Reversal on this ground is unwarranted unless it appears
18        'that upon no hypothesis whatever is there sufficient evidence to
          support [the conviction].'  [Citation.]  In People v. Anderson
19        [(1968)] 70 Cal.2d [15,] 26-27, we identified three categories of
          evidence relevant to resolve the issue of premeditation and
20        deliberation:  planning activity, motive, and manner of killing.
          However, as later explained in People v. Pride (1992) 3 Cal.4th
21        195, 247:  'Anderson does not require that these factors be present
          in some special combination or that they be accorded a particular
22        weight, nor is the list exhaustive.  Anderson was simply intended
          to guide an appellate court's assessment whether the evidence
23        supports an inference that the killing occurred as the result of
          preexisting reflection rather than unconsidered or rash
24        impulse.  [Citation.]'  Thus, while premeditation and deliberation
          must result from "'careful thought and weighing of
25        considerations'" (70 Cal.2d at p. 27), we continue to apply the
          principle that '[t]he process of premeditation and deliberation does
26        not require any extended period of time.  "The true test is not the

duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly . . . .” [Citations.] (People v. Bolin (1998) 18 Cal.4th 297, 331-32.)’ [Citation.]” (People v. Manriquez (2005) 37 Cal.4th 547, 577.)

Wilson and Lopez first assert that evidence of planning was insubstantial.  To make this assertion, they rely on the prosecutor’s argument.  “The prosecution contended,” state the defendants, “that Wilson and Lopez ran into Ciancio and identified themselves as gang members.  A fight ensued between Ciancio and Lopez. Ciancio won the fight, injuring Lopez’s face in several places. Lopez took out a handgun and fired a single shot at Ciancio.”  The defendants call this prosecutorial argument the “facts” and then attempt to show that these “facts” do not support a finding that they planned the attempted murder of Ciancio.  As the trial court informed the jury . . . attorneys’ statements are not evidence.  We review the evidence, not arguments, when determining whether the evidence is sufficient to support a conviction.

The actual evidence was considerably more damning than the defendants concede.  Wilson and Lopez, in the dark of night, issued a gang challenge by asking Ciancio where he was from and whether he was from a rival gang.  They pursued Ciancio, even though he was trying to leave the situation, and Lopez reached for the loaded handgun in his waistband.  When Ciancio struck at Lopez in self-defense, Wilson yelled, “Shoot that mother fucker.” The evidence supports a finding Wilson and Lopez planned the attempted murder even before Ciancio struck at Lopez, accusing Ciancio of rival gang membership and chasing him down with a loaded handgun, which Lopez drew.  Furthermore, planning took place after Ciancio struck at Lopez when Wilson called on Lopez to shoot Ciancio, who was fleeing.

Wilson and Lopez also assert there was no evidence of motive and that the manner in which they tried to kill Ciancio did not support an inference they had a preconceived design.  The motive was to benefit the street gang by violence and intimidation.  The preconceived design unfolded when, acting as fellow gang members on their own turf and with a loaded gun, they chased down someone they suspected of being in a rival gang.  Even if considered only after Ciancio struck at Lopez, the preconceived design was to kill someone who showed disrespect.  As noted by the Supreme Court, such conception of a killing can happen rapidly, especially when the defendants have decided in advance, as gang membership teaches them, to respond violently in such circumstances.

(Slip Op. at p. 15-18.)

1    Viewing the evidence in the light most favorable to the prosecution, and for the reasons

2  described by the California Court of Appeal, there was sufficient evidence from which a rational

3  trier of fact could have found that Petitioner was guilty of attempted deliberate and premeditated

4  attempted  murder.  As stated by the California Court of Appeal, there was evidence at

5  Petitioner's trial which indicated that Lopez reached for the gun before he was struck and that

6  when Ciancio was fleeing, Petitioner yelled to Lopez to shoot Ciancio.  The jury was responsible

7  for evaluating the credibility of the witnesses and was entitled to rely on evidence indicating that

8  the attempted murder was deliberate and premeditated.  Under California law, the process of

9  premeditation and deliberation does not require any extended period of time; "thoughts may

10  follow each other with great rapidity and cold, calculated judgment may be arrived at quickly."

11  People v. Hughes, 27 Cal. 4th 287, 371, 116 Cal. Rptr. 2d 401, 39 P.3d 432 (2002).  The state

12  court opinion rejecting Petitioner's argument with respect to Claim III was not contrary to or an

13  objectively unreasonable application of federal law.  It applied and properly determined that the

14  requisite substantive elements of premeditation and deliberation were met as defined under state

15  law in denying Petitioner's insufficiency claim.  Thus, Petitioner is not entitled to federal habeas

16  relief on Claim III.

17    VI.  CONCLUSION

18    For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

19  habeas corpus be denied.

20    These findings and recommendations are submitted to the United States District Judge

21  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

22  after being served with these findings and recommendations, any party may file written

23  objections with the court and serve a copy on all parties.  Such a document should be captioned

24  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

25  shall be served and filed within seven days after service of the objections.  The parties are

26  advised that failure to file objections within the specified time may waive the right to appeal the

1   District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

2   elects to file, Petitioner may address whether a certificate of appealability should issue in the

3   event he elects to file an appeal from the judgment in this case.  *See* Rule 11, Federal Rules

4   Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

5   when it enters a final order adverse to the applicant).

6   DATED:  January 31, 2011

7

8   _____

9   TIMOTHY J BOMMER
    UNITED STATES MAGISTRATE JUDGE
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26